515 So.2d 1150 (1987)
Rufus Lanny INMAN
v.
STATE of Mississippi.
No. 57236.
Supreme Court of Mississippi.
November 18, 1987.
George F. West, Jr., Natchez, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the Court:
Rufus Lanny Inman was convicted by the Circuit Court of Adams County of the forcible rape of D.A.C. and sentenced to forty (40) years imprisonment. Aggrieved by his conviction Inman has assigned three errors on this appeal:
*1151 I. The verdict of the jury is contrary to the overwhelming weight of the evidence;
II. It was error for the court not to grant a continuance in that the defense did not have ample time to adequately prepare for this case; and
III. It was error for the court and the attorney for the defendant not to excuse a juror.

I.

WAS THE VERDICT OF THE JURY CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
At trial the prosecutrix testified that on Tuesday night, March 26, 1985, she was with Ann Arceneaux at the Twilight Club where they "had a couple of drinks and shot a couple of games of pool."[1] After leaving the Twilight Club, Ann Arceneaux and the prosecutrix went with some friends of Ann's to Becky's Lakeside Inn (on Lake St. John). At Becky's Lakeside Inn, the prosecutrix "shot a game of pool, drank a couple of beers, and talked."
When they left Becky's Lakeside Inn, the prosecutrix and Ann Arceneaux rode back to the Twilight Club. The prosecutrix testified that while she was sitting near the pool tables in the Twilight Club, Lanny Inman approached her and began talking to her. According to the prosecutrix, Inman asked her if she wanted to ride over to Lasers, a club that had recently opened near Natchez. The prosecutrix alleged that she rode to Lasers with Lanny Inman, whom she had known for three or four years.
According to the prosecutrix, she and Inman stayed at Lasers until approximately 2:00 a.m. March 27, when they left together. She testified that Lanny Inman was to take her home, instead, Inman drove down a dark country road. Inman instructed the prosecutrix to look under the seat of the car and get the gun. She complied and handed the gun to Inman. (She explained that she was not alarmed by this request since she had brothers who hunt and that "it's not uncommon for guys to shoot at things even at night ...").
The prosecutrix testified that later Inman stopped the car, pointed the gun at her, and told her to get out of the car. After getting out of the car, she attempted to flee while Inman was getting a lounge chair out of the car. The prosecutrix stated that Inman caught her and struck her in the mouth with his fist. She testified that Inman unfolded the lounge chair on the side of the road, forced her (at gunpoint) to disrobe, and made her lie down on the lounge chair. The prosecutrix alleged that Inman then raped her.
The prosecutrix testified that she was forced to get back in the car and Inman drove down a gravel road. Inman allegedly stopped the car and told her to get out again. She said that she tried again to escape but couldn't run fast because she kept tripping over a blanket or sheet that she had wrapped around her body. She stated that Inman caught her and struck her over the left eye with the pistol.
According to the prosecutrix, Inman again made her lie down on a lounge chair (which he had unfolded beside the car) and forced her to perform an act of fellation. After this she was allegedly forced back in the car where she managed to put her pants and jacket on.
The prosecutrix testified that she was afraid that Inman was going to kill her so she tried to jump out of the moving car. It is alleged that when Inman grabbed her, she bit him and began stepping on the brake. She stated that she finally escaped from the car and Inman drove off. She testified that she ran to some nearby houses and began knocking on doors. The third or fourth house that she came to was inhabited by Robert Wimley and Archie Williams.
Mr. Wimley testified that he answered a knock at his door and found the prosecutrix *1152 standing at the threshold. Robert Wimley and his cousin Archie Williams testified that the prosecutrix was bleeding from cuts on her face. Mr. Wimley telephoned his sister, Corliss Rose Chapman, who lived next door, and she came over and took care of the prosecutrix. Archie Williams testified for the State that he was at Robert Wimley's house on the morning in question and he saw the prosecutrix and she claimed to have been beaten by Lanny Inman.
Thomas Joseph Hutton, a bouncer at Lasers, also testified for the State. He stated that he went out to Lanny Inman's car and was shown a small caliber nickel plated revolver. Hutton further alleged that he noticed some flowers and a lounge chair in the back of the car which Inman was driving. Hutton testified that the prosecutrix and Inman (both of whom he knew) were together at Lasers on the night in question.
Rita Mounger, the woman with whom Inman was living at the time of the incident, testified that on Tuesday, March 26, she and her daughter and Inman had gone out riding and shooting a gun. She further testified that Inman had picked some dogwood flowers and placed them in the back of the car. Mounger testified that she usually left her small caliber revolver under the seat of her car, which Inman was permitted to drive.
Dr. Brenda Hines was working at Jefferson Davis Hospital on the morning of March 27, 1985, when the prosecutrix was brought into the emergency room and examined. Dr. Hines testified that the prosecutrix required numerous sutures to close the cuts on her face and that tests revealed the presence of nonmotile sperm in the prosecutrix' vagina. An acid-photophase test also indicated that there had been sexual exposure.
Lanny Inman testified that he did not see the prosecutrix on Tuesday night or Wednesday morning when the attack allegedly occurred. Instead, he stated that he had gone out with her on Monday night. Inman denied that he left Rita Mounger's house Tuesday night, March 27 and testified that he watched a movie and went to sleep on the couch.
The prosecutrix accused Lanny Inman of raping her. Subsequent tests confirmed that sexual activity had taken place. The prosecutrix' assertion that Lanny Inman struck her is corroborated by her wounds. The prosecutrix contended that she was raped on a lounge chair, Rita Mounger testified that she owned such a chair, and Joey Hutton testified that he saw such a chair in the car that Inman was driving on the night in question.
Inman asserts that he was with the prosecutrix on Monday night, March 25, rather than Tuesday night when she was assaulted. Joey Hutton testified that he saw flowers in the back of Inman's car on the night that the prosecutrix and Inman were together. Rita Mounger testified that those flowers were not picked until Tuesday.
Inman bases this assignment on the facts that the sperm found in the prosecutrix' vagina were nonmotile and that there were no bite marks found on his body. (The prosecutrix testified that she had bitten him.) At trial Dr. Hines testified that sperm could lose motility at "any period of time between ejaculation and 72 hours." Inman was not examined for bite marks until several days after the incident. The prosecutrix' allegations were corroborated by her "physical and mental condition after the incident, as well as the fact that she immediately reported the rape." Christian v. State, 456 So.2d 729, 734 (Miss. 1984); Goss v. State, 465 So.2d 1079, 1082 (Miss. 1985); see also, Barker v. State, 463 So.2d 1080, 1082 (Miss. 1985). When the evidence is considered in the light most favorable to the verdict, this assignment is without merit. Fisher v. State, 481 So.2d 203, 212 (Miss. 1985).

II.

WAS IT ERROR FOR THE COURT NOT TO GRANT A CONTINUANCE IN THAT THE DEFENSE DID NOT HAVE AMPLE TIME TO ADEQUATELY PREPARE FOR THIS CASE?
On May 7, 1985, an indictment was filed charging Rufus Lanny Inman with forcible *1153 rape. Shortly thereafter Inman's attorney filed a Brady motion, and a Rule 4.09 omnibus hearing motion, and a Rule 4.06 discovery motion. The omnibus hearing was held on July 30, 1985, the day before the trial began.
At the hearing Inman's attorneys were supplied with some written statements and were allowed to view some previously undisclosed video tape recorded statements. While viewing these video taped statements Inman's attorneys first became aware of the existence and identity of Jimmy Johnese, and Carl J. Smith, who were witnesses to some of the events in question. Inman's attorneys wished to interview the two previously undisclosed witnesses and sought a continuance for that purpose. This request was denied.
Inman argues that Rule 4.09 and Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice were violated and that the trial court's failure to grant his request for a continuance necessitates reversal.
Inman was granted an omnibus hearing pursuant to Rule 4.09, Uniform Criminal Rules of Circuit Court Practice which provides in part:
An omnibus hearing may be held at request of counsel or on court's own initiative if the defendant, upon arraignment, enters a plea of not guilty. The hearing shall be set at least three days prior to trial; however, the court should allow counsel sufficient time to conduct further investigation, complete discovery and continue plea discussions. (Emphasis added).
Rule 4.09, Uniform Criminal Rules of Circuit Court Practice.
By its very terms, Rule 4.09 requires that the omnibus hearing "shall be set at least three days prior to trial." Rule 4.09, Uniform Criminal Rules of Circuit Court Practice. The failure to comply with this requirement was a violation of Rule 4.09.
Although Inman's attorneys filed a discovery motion pursuant to Rule 4.06 on June 4, 1985, the State did not begin providing the defense with witnesses' statements until the omnibus hearing which was held the day before trial. The State erred in withholding this information until the eleventh hour. It is well settled that "A written request made by the defense is all that is necessary to impose upon the prosecution the obligation to make discovery  and to make discovery seasonably." Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986), citing Morris v. State, 436 So.2d 1381, 1387 (Miss. 1983). Recently in Stewart v. State, 512 So.2d 889 (Miss. 1987), this Court said, "A request is all that is necessary." Stewart, at 891.
In Stewart v. State, supra, we reversed a conviction because the State withheld discovery until the day before trial and we stated, "Discovery, to be sufficient, must be made at a time far enough in advance of trial to give the defense a `meaningful opportunity' to make use of it." Stewart, at 892. See also, Turner v. State, 501 So.2d 350 (Miss. 1987); Gray v. State, 487 So.2d 1304 (Miss. 1986); Henry v. State, 484 So.2d 1012 (Miss. 1986); McKinney v. State, 482 So.2d 1129 (Miss. 1986). Inman was entitled to a reasonable opportunity to locate and interview the two newly discovered witnesses.
We have addressed the issue of belated discovery in Foster v. State, 484 So.2d 1009 (Miss. 1986), and held:
Where the state is tardy in furnishing discovery which it was obligated to disclose, the defendant is entitled upon request to a continuance postponement of the proceedings reasonable under the circumstances. Henry v. State, 484 So.2d 1012, 1014 (Miss. 1986); McKinney v. State, 482 So.2d 1129, 1131 (Miss. 1986); Cabello v. State, 471 So.2d 332, 343 (Miss. 1985); Box v. State, 437 So.2d 19, 26 (Miss. 1983) (Robertson, J. concurring). By no means does this mean invariably that the defendant will be entitled to a continuance until the next term of court. There will no doubt be cases where postponement of a day or two, or in some cases even an hour or two, will suffice. Because the trial judge refused to grant Foster a reasonable continuance under the circumstances this conviction must be *1154 reversed and the case remanded for a new trial.
Foster, 484 So.2d at 1011.
See also, Stewart v. State, 512 So.2d 889, 892-93 (Miss. 1987).
Having received the untimely discovery furnished by the State, the defense was entitled to a reasonable opportunity to make use of it. This includes a reasonable opportunity to locate and interview newly discovered witnesses, if a continuance was necessary to accomplish this, then the defense was entitled to a continuance.
We hold that the failure to grant Inman's request for a continuance coupled with the violations of Rules 4.06 and 4.09 of the Uniform Criminal Rules of Circuit Court Practice necessitate the reversal of this case.
Because we reverse on Inman's second assigned error, we need not address the alleged error concerning the conduct of a juror. Since Inman will be tried by a different jury the issue is of no consequence.
REVERSED AND REMANDED FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, ANDERSON, GRIFFIN, and ZUCCARO, JJ., concur.
NOTES
[1] The establishment is variously referred to as "84," "Twilight Club," "Jake's," "Jake's 84 Club," and "84 Twilight Club."